IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
ASSIGNED ON BRIEFS SEPTEMBER 9, 2009

IN RE: O.J.B., dob 07/24/05, A Child Under 18 Years of Age

Direct Appeal from the Juvenile Court for Shelby County
No. R7154     Herbert J. Lane, Special Judge

No. W2009-00782-COA-R3-PT - Filed November 2, 2009

This case involves the termination of parental rights of a mother and father. Both parents were addicted to crack cocaine, and the child tested positive for cocaine at birth. The child was taken into DCS custody and placed in a foster home at three days old. Three months later, the mother was arrested and sentenced to three years in prison as a habitual offender. When the child was 18 months old, DCS filed a petition to terminate the mother's parental rights based on the ground of abandonment by an incarcerated parent. The father had visited the child only twice since she was placed in foster care, and DCS sought to terminate his parental rights for failure to file a petition to establish paternity. The trial court terminated both parents' parental rights upon finding that termination was in the child's best interest. Both parents appeal. We affirm.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY,J., joined.

Alicia A. Howard, Memphis, TN, for Appellant/Mother

Janis H. Benson, Memphis, TN, for Appellant/Father

Robert E. Cooper, Sr., Attorney General and Reporter, Michael E. Moore, Solicitor General, Lindsey O. Appiah, Nashville, TN, for Appellee

OPINION

# I. FACTS & PROCEDURAL HISTORY

Jennifer B. ("Mother") gave birth to the child, Olivia B., on July 24, 2005. The hospital contacted the Tennessee Department of Children's Services ("DCS") because Mother and Olivia tested positive for drugs. Mother admitted to using cocaine while she was pregnant with Olivia. She also stated that there were outstanding warrants for her arrest in Mississippi and Tennessee.[1] Mother identified Jerry F. as Olivia's father, and the DCS case manager attempted to contact him to inform him of Olivia's birth. However, he did not answer or return her calls at that time. No one was listed as the child's father on the birth certificate.

Mother identified her mother ("Grandmother") as a possible placement for Olivia, but when DCS approached Grandmother about taking custody of Olivia, Grandmother declined, explaining that she was already caring for two of Mother's children, ages 15 and 5, and "just could not take another child." Mother also had a two-year-old child who had tested positive for cocaine and birth, and he had apparently been removed from her custody by the Mississippi Department of Human Services. He resided with his father in California. DCS contacted Mother's brother about taking custody of Olivia, but he declined to take her and said that he had a poor relationship with Mother due to her drug addiction. On July 27, DCS filed a petition to adjudicate Olivia dependent and neglected. A protective custody order was entered that same day granting DCS temporary custody of Olivia, and she was placed in a foster home.

Father left a message for the case manager on July 28 and stated that he was out of town. He said that he was unable to assume custody of Olivia but identified his aunt as a possible placement for her. DCS had numerous conversations with Aunt about Olivia, but according to DCS records, she stopped returning their telephone calls. Thus, Olivia remained in the foster home.

Following a child and family team meeting, supervised visits were scheduled to take place every two weeks for two hours. Neither parent showed up for the first scheduled visit in August. Mother and Father both attended a visit with Olivia on September 21, 2005, but they were only there for one hour. On September 27, 2005, Olivia was adjudicated dependent and neglected. Neither parent attended the hearing, and Mother later told the DCS case manager that she did not attend because she feared she would be taken to jail. Neither parent visited Olivia in October or November. On or about October 8, 2005, Mother was charged with credit card theft and burglary in Mississippi. On November 6, 2005, Mother turned herself in to the police, and she was sentenced to three years in prison in Mississippi as a habitual offender. DCS learned that Mother was in prison in December

---

[1] In 1998, Mother was charged with possession of marijuana and cocaine and was placed on deferred adjudication. Mother started using crack-cocaine in 2002, and she went to prison that year, serving 18 months for grand larceny. She also received a suspended 5-year sentence for forgery and a suspended 3-year sentence for possession of marijuana. In 2004, she was arrested and charged with felony theft of property. She served 28 days upon pleading guilty to a lesser offense and was placed on probation. In March of 2005, Mother was cited for possession of a controlled substance, criminal attempt at possession of marijuana, and criminal attempt at possession of cocaine, for which she apparently served 3 days in jail. Mother also served 3 days in jail for failure to appear for booking and processing. These charges also caused her to be in violation of her probation.

of 2005. Father failed to visit Olivia in December 2005. On or about January 11, 2006, Father showed up at the DCS office unannounced and spoke with the case manager and her supervisor. Among other things, the parties discussed Father's obligation to legitimate Olivia. Father attended his second visit with Olivia on January 25, 2006.

In March of 2006, the permanency plan goal was changed from reunification with parent to adoption or exit custody to live with relative. The juvenile court approved the new permanency plan, noting that Mother was incarcerated and Father had not visited the child since January. The court also found that Father had "refused the Department's offer of paternity testing to legitimate the child." According to the affidavit of reasonable efforts submitted by the DCS case manager, Father "refused services from DCS and stated he would contact J[uvenile] C[ourt] himself to have the said child legitimated."

On January 22, 2007, DCS filed a petition to terminate the parental rights of Mother and Father. Amended petitions were subsequently filed, which alleged that Mother's rights should be terminated on the ground of "abandonment by an incarcerated parent" and Father's rights should be terminated for "failure to legitimate."[2] The court appointed a guardian ad litem, and attorneys were appointed for Mother and Father. Father filed a petition to establish parentage of Olivia on June 6, 2007, and an order of legitimation was entered on December 12, 2007. Trial on the termination petition was held on December 8 and 9, 2008, and the trial judge heard additional arguments from the parties' attorneys on December 12, 2008. The court entered an order terminating both parents' parental rights on March 2, 2009. The court found that Mother had abandoned Olivia pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(iv) by engaging in such conduct prior to her incarceration as to exhibit a wanton disregard for Olivia's welfare. The court found that Father had failed to legitimate Olivia after notice of alleged paternity, so that grounds existed to terminate his parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(9)(A)(vi). Finally, the court found by clear and convincing evidence that it was in Olivia's best interest for both parents' rights to be terminated. Mother and Father timely filed notices of appeal.

## II. ISSUES PRESENTED

On appeal, Mother states the following issues for review:

1.      Whether the trial court erred by finding that [Mother] abandoned her child within the meaning of the statute;

---

[2] Although other grounds were also alleged in the petitions, counsel for DCS announced at the beginning of trial that it was only pursuing termination of Father's rights on the grounds of abandonment and failure to legitimate, and it sought termination of Mother's rights based on the ground of abandonment by an incarcerated parent. Thus, we will not address the other grounds alleged in the petitions, even though the trial court ultimately found evidence to support termination based on additional grounds. We also note that DCS's final amended petition did not allege abandonment by Father, and due to our conclusion regarding one of the grounds actually alleged, we need not address abandonment by Father.

2.      Whether the trial court erred by finding abandonment in the absence of proof of notice;
3.      Whether the trial court erred by finding that termination of [Mother]'s parental rights was in the best interests of the child.

Father presents the following additional issues for review:
4.      Whether the trial court erred in terminating [Father]'s parental rights when the court made no finding that [DCS] exercised "reasonable efforts";
5.      Whether [DCS] failed to exercise reasonable efforts to place the minor child in a relative placement with [] paternal aunt.

For the following reasons, we affirm the decision of the juvenile court terminating both parents' parental rights.

### III.   STANDARDS FOR REVIEWING TERMINATION CASE

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *Id.* A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Several grounds for termination are listed in section (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Audrey S.*, 182 S.W.3d at 860. Because no civil action carries graver consequences than a petition to sever family ties forever, both of the elements for termination must be proven by clear and convincing evidence. *Id.* at 860-61. In sum, "[t]o terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). Clear and convincing evidence has been defined as evidence that "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *In re L.J.C.*, 124 S.W.3d 609, 619 (Tenn. Ct. App. 2003) (quoting *In the Matter of: C.D.B., S.S.B., & S.E.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App.

2000)). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. **In re Audrey S.**, 182 S.W.3d at 861.

Because of this heightened burden of proof in parental termination cases, on appeal, we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). **In re Audrey S.**, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings de novo in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. **Id.** Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) clearly and convincingly establish the elements required to terminate parental rights. **Id.** Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed de novo with no presumption of correctness. **In re R.L.F.**, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008) (citing *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008)).

## IV. DISCUSSION

### A. Abandonment by an Incarcerated Parent

Mother first challenges the trial court's decision to terminate her parental rights pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(iv), which address abandonment by an incarcerated parent. For purposes of terminating parental rights, "abandonment" has several statutory definitions, but the one relevant to this case provides that abandonment occurs when:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv).[3] This test for abandonment "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. Because incarceration severely compromises a parent's ability to perform his or her parental duties, "[a] parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.* (citing James G. Dwyer, *A Taxonomy of Children's Existing Rights in State Decision Making About Their Relationships*, 11 Wm. & Mary Bill Rts. J. 845, 958 (2003)). Thus, incarceration serves as "a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

"The ground of wanton disregard does not require that the conduct referred to occur within the four month window prior to incarceration." *In re D.M.*, No. M2009-00340-COA-R3-PT, 2009 WL 2461199, at *4 (Tenn. Ct. App. Aug. 12, 2009). This test for abandonment "is not expressly limited to any particular four-month period." *In re Audrey S.*, 182 S.W.3d at 865. Therefore, "no specified time frame limits which pre-incarceration acts or omissions are subject to review." *In re B.P.C.*, No. M2006-02084-COA-R3-PT, 2007 WL 1159199, at *9 (Tenn. Ct. App. W.S. Apr. 18, 2007). In fact, "the conduct may occur before the birth of the child whose welfare is thereby put at risk." *In re T.M.H.*, No. M2008-02427-COA-R3-PT, 2009 WL 1871873, at *7 (Tenn. Ct. App. Jun. 29, 2009) *perm. app. denied* (Tenn. Sept. 18, 2009); *In re D.M.*, 2009 WL 2461199, at *4.

"We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68 (citing *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7-8 (Tenn. Ct. App. Jan. 11, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004); *In re C.T.S.*,

---

[3] The statute provides an additional definition for abandonment, not alleged in this case, if the parent is incarcerated at or near the time of the filing of a termination petition and the parent willfully failed to visit or support the child during the four months immediately preceding his or her incarceration. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv).

These additional tests are meant to address the difficulties inherent in proving that a parent has *willfully* failed to visit or support a child for four consecutive months prior to a termination petition when the parent was incarcerated during all or part of that time. *In re Audrey S.*, 182 S.W.3d at 865. As the *Audrey S.* Court explained:

Incarceration necessarily restricts a prisoner's freedom of movement, and many prisoners have no resources with which to continue paying child support once their crimes and resulting imprisonment have forced them to forfeit their regular jobs. Thus, the parent's incarceration provides a ready-made excuse for his or her failure to visit or support the child during the four-month period made relevant by the first statutory definition of abandonment. However, the strong public interest in providing procedures for terminating the parental rights of unfit parents does not dissipate simply because a parent's irresponsible conduct has reached the level of criminal behavior and incarceration.

*Id.* at 865-66.

156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *In re C.W.W.*, 37 S.W.3d 467, 474-75 (Tenn. Ct. App. 2000)). Furthermore, "[o]ur courts have consistently held that an incarcerated parent who has multiple drug offenses and wastes the opportunity to rehabilitate themselves by continuing to abuse drugs, resulting in revocation of their parole and reincarceration, constitutes abandonment of the child, and demonstrates a wanton disregard for the welfare of the child." *In re DNG*, No. M2003-02810-COA-R3-PT, 2004 WL 2314534, at *2 (Tenn. Ct. App. E.S. Oct. 13, 2004) (citing *In re C.W.W.*, 37 S.W.3d at 473; *State v. J.S.*, 2001 Tenn. App. Lexis 796 (Tenn. Ct. App. 2001); *G.M.C. v. A.V.I.*, 2000 WL 1195686 (Tenn. Ct. App. 2000); *State v. D.G.S.L.*, 2001 Tenn. App. Lexis 941 (Tenn. Ct. App. 2001); *State v. Grant*, 2002 Tenn. App. Lexis 158 (Tenn. Ct. App. 2002); *Dept. Of Children's Serv. v. Wiley*, 1999 WL 1068726 at * 7 (Tenn. Ct. App. 1999)).

In this case, Mother was incarcerated when the termination petition was filed, and the trial court found that Mother's pre-incarceration conduct demonstrated a wanton disregard for Olivia's welfare. In explaining its finding, the court noted that Mother ingested drugs while she was pregnant and pled guilty to additional criminal charges shortly after Olivia's birth. At trial, Mother admitted that she used cocaine three to four times per week throughout the eight months of her pregnancy.[4] She had been in a rehabilitation program during her pregnancy but was discharged for using cocaine and for meeting with Father, because she had identified him as someone with whom she used drugs. Olivia was born with cocaine in her system. In addition, Mother had previously given birth to another drug-exposed child who was removed from her custody. At trial, Mother admitted that she burglarized Grandmother's home and stole her credit card in order to finance her drug habit. She stated that although Grandmother did not discover and report the missing credit card until after Olivia was born, she committed the crimes while she was pregnant with Olivia. Mother testified that she knew she would not be able to care for Olivia if she went to jail. As a result of these crimes, Mother was a fugitive and then incarcerated for the first three years of Olivia's life. Considering all these circumstances, we find clear and convincing evidence that Mother demonstrated a wanton disregard for Olivia's welfare. *See* *State, Dept. of Children's Services v. Harville* No. E2008-00475-COA-R3-PT, 2009 WL 961782, at *8 (Tenn. Ct. App. Apr. 9, 2009) (stating that exposing the child to cocaine in utero demonstrated a wanton disregard for the child's welfare); *In re S.L.A.*, 223 S.W.3d 295, 300 (Tenn. Ct. App. 2006) (finding that a mother demonstrated a wanton disregard for her child by ingesting drugs during her pregnancy and while breastfeeding); *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004) (stating that the mother's ingestion of crack cocaine during her pregnancy "clearly exhibit[ed] a wanton disregard for the welfare of the child"); *see also* *In re Audrey S.*, 182 S.W.3d at 867-68 (stating that "probation violations, repeated incarceration, criminal behavior, [and] substance abuse . . . can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child.").

On appeal, Mother cites the trial judge's oral remark that Mother was "certainly aware of the consequences of taking cocaine during pregnancy" due to the fact that she had already given birth to another child who was drug-exposed and removed from her custody. Mother claims that "the trial

---

[4] Mother did not dispute that she gave birth to Olivia when she was eight months pregnant, but when asked if Olivia was born premature, Mother stated, "No. She was my fourth child. So they come a little easier."

court's finding that [Mother] knew and was aware of the consequences of taking cocaine during her pregnancy is contrary to the weight of the evidence presented" because Mother testified that her drug-exposed son did not have any physical problems. We find Mother's argument frivolous. Regarding her drug use, Mother testified, "I knew what I was doing was wrong at that time, I just couldn't break myself away from it." In a letter Mother had written regarding her addiction, which was entered into evidence, she wrote about her use of crack cocaine while she was pregnant with her son:

> In 2002 I got pregnant and although I tried on my own to quit, I failed miserably. Now, not only was I destroying my own life, I was putting my own child's life in danger. That is one of the things that I am most ashamed of. You'd think that getting pregnant would make you quit automatically, but all my efforts failed.

Clearly, Mother realized that she was risking the health of her children by ingesting crack cocaine while she was pregnant. The fact that these risks did not materialize does not relieve Mother of responsibility for her actions.[5] As discussed above, her behavior exhibited a wanton disregard for Olivia's welfare.

### B. Notice

Next, Mother contends that the trial court erred in terminating her parental rights on the ground of abandonment "in the absence of notice," citing only Tennessee Code Annotated section 37-2-403. This statute establishes "requirements for a permanency plan for a child placed in foster care" and "requirements for notice to parents of the definition and potential consequences of 'abandonment' as that term is defined in Tenn. Code Ann. § 36-1-102." *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *7 (Tenn. Ct. App. June 30, 2005). First, the statute requires the statutory definition of "abandonment" and the criteria and procedures for termination of parental rights to be included in the permanency plan, which is to be signed by the parent. Tenn. Code Ann. § 37-2-403(a)(2)(A). Second, at the hearing on the court's review of the permanency plan, "the court shall explain on the record the law relating to abandonment contained in § 36-1-102, and shall explain that the consequences of failure to visit or support the child will be termination of the parents' or guardians' rights to the child[.]" Tenn. Code Ann. § 37-2-403(a)(2)(B)(i). Although the statute includes specific requirements about notice of failure to support or failure to visit, "the statute's repeated references to abandonment as defined in § 36-1-102 make it clear that the notice requirements apply to all definitions of abandonment." *In re J.L.E.*, 2005 WL 1541862, at *7 n.10. "If the parents do not appear at permanency plan hearings or cannot be provided notice of such hearings, DCS may still proceed to terminate parental rights on the ground of abandonment 'under

---

[5] Olivia's foster father testified that when she was a newborn, she would have "terrors" at night, where she would wake up with "whole body shivers" and "she would just scream . . . for several hours as her body was trying to get rid of all the drugs out of her system." He also said she had additional doctor's appointments in order to monitor her health due to her being drug addicted. Thankfully, however, it appears that Olivia is now healthy.

§ 36-1-102' only if DCS demonstrates specified things at the time of the termination proceeding." *Id.* at \*7 (citing Tenn. Code Ann. § 37-2-403(a)(2)(B)(ii)). DCS may demonstrate:

(a) That the court record shows, or the petitioning party presents to the court a copy of the permanency plan or plan of care that shows that the defendant parents or legal guardians, subsequent to the court review in subdivision (a)(2)(B)(i), has signed the portion of the permanency plan or plan of care that describes the criteria for establishing abandonment under § 36-1-102, or that the court record shows that, at a subsequent hearing regarding the child, the court made the statements to the parents or legal guardians required by subdivision (a)(2)(B)(i).

(b) By an affidavit, that the child's permanency plan or plan of care containing language that describes the criteria for establishing abandonment under § 36-1-102 was presented by the agency party to the parents or guardians at any time prior to filing the termination petition, or that there was an attempt at any time to present the plan that describes the criteria for establishing abandonment under § 36-1-102 to the parents or guardians at any time by the agency party, and that such attempt was refused by the parents or guardians.

(c) That, if the court record does not contain a signed copy of the permanency plan or plan of care, or if the petitioning agency cannot present evidence of a permanency plan or plan of care showing evidence of such notice having been given or an affidavit showing that the plan was given or that the plan was attempted to be given to the parents or guardians by the agency and was refused by the parents or guardians, and, in this circumstance, if there is no other court record of the explanation by the court of the consequences of abandonment . . . at any time, then the petitioning agency shall file with the court an affidavit in the termination proceeding that describes in detail the party's diligent efforts to bring such notice required by subdivision (a)(2)(B)(i) to such parent or guardian at any time prior to filing the agency's filing of the termination petition.

Tenn. Code Ann. § 37-2-403(a)(2)(B)(ii).

In short, Mother contends that DCS failed to demonstrate that the definition and consequences of abandonment were explained to her. Mother correctly notes that DCS did not directly address the statutory notice requirement at trial. Mother did not raise the issue of notice during trial either, and her attorney first addressed the issue during the attorneys' final arguments to the court on December 12. The trial court found that "[Mother] admitted to knowing that her rights could be terminated if she abandoned her child, [and] DCS testified that the Adoption and Safe Families Act Criteria was explained to her prior to going to jail."

The permanency plan is not included in the record for us to determine whether it was signed by Mother. In addition, Mother was not directly asked whether she signed the permanency plan or

whether the court at the review hearing explained the law relating to abandonment, although she testified as follows:

> Q. Okay. Now, do you remember going to Child and Family Team Meetings and sitting down with DCS and going over permanency plans?
> A. Yes, sir.
> Q. And did you know that you had to visit and remedy the circumstances of the removal and all of those good things.
> A. Yes.
> Q. And you knew that if you didn't visit or if the circumstances couldn't be remedied, that DCS would file a petition to terminate?
> A. Yes.

The team leader for DCS's child protective services unit testified that Mother was given "a copy of the PTO and a copy of her Parent Rights Handbook," but there is no explanation in the record regarding the content of these documents. The guardian ad litem asked one of the case managers if it was possible that no one explained the "TPR and the need for visits and the need to follow the permanency plan" to Mother, and the case manager said no. The case manager said that that information is discussed at every permanency plan staffing, and she said it was also explained in the permanency plan itself.[6]

On appeal, DCS points out that there are no specified time frame limits for determining whether Mother exhibited a wanton disregard for Olivia's welfare. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv) (requiring only that such conduct occur "prior to incarceration"). Accordingly, DCS argues that since, in this case, "the time period considered in determining whether [Mother] exhibited a wanton disregard for her child was the period before O.B.'s birth, there was no harm to [Mother] if in fact DCS failed to give her notice after O.B.'s birth as to what conduct constituted abandonment and that abandonment was grounds for termination, as the wanton conduct had already occurred by that point." We agree. In this case, the conduct that formed the basis for terminating Mother's parental rights, i.e., her criminal activity and ingestion of cocaine while pregnant, occurred prior to DCS's involvement with Olivia and the creation of the permanency plan. Thus, Mother was not prejudiced if in fact DCS failed to inform her of the definition of abandonment once it became involved. "The notice provisions of the statute are designed to inform parents, before they engage in conduct constituting abandonment, of the potential consequences of that conduct. Otherwise, it

---

[6] Thus, it appears likely that DCS provided the required notice. However, the statute requires that DCS demonstrate "*By an affidavit*, that the child's permanency plan or plan of care containing language that describes the criteria for establishing abandonment under § 36-1-102 was presented by the agency party to the parents or guardians at any time prior to filing the termination petition[.]" Tenn. Code Ann. § 37-2-403(a)(2)(B)(ii) (emphasis added). The case manager's testimony that the "TPR and the need for visits" were included in the permanency plan was, at least arguably, insufficient. In addition, there is no evidence that Mother signed the permanency plan to satisfy section (a)(2)(A).

has no real purpose." ***In re J.L.E.***, 2005 WL 1541862, at *9.[7]  Mother has not cited any cases in support of her argument, and we are not aware of any case reversing the termination of a parent's parental rights under circumstances such as these for DCS's failure to comply with the statutory notice provisions.  As such, we conclude that Mother's argument does not provide a sufficient basis for reversing the trial court's termination of her parental rights.

### C.  Reasonable Efforts

Father claims that the trial court erred in terminating his parental rights without making an explicit finding as to whether DCS utilized reasonable efforts.  However, "[DCS]'s obligation to make reasonable efforts to preserve, repair, or restore a parent-child relationship is not implicated in every termination proceeding." ***In re C.M.M.***, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004).  Typically, DCS is required to demonstrate that it has made reasonable efforts to reunite a child with his or her parents in termination proceedings based on the grounds in Tennessee Code Annotated section 36-1-113(g)(1)-(3), but is not required to demonstrate that it has made reasonable efforts at reunification in proceedings based on grounds (g)(4)-(8). ***Id.*** at *7, n.26, 27; *see, e.g.*, ***State, Dept. of Children's Services v. M.R.N.***, No. M2006-01705-COA-R3-PT, 2007 WL 120038, at *12 (Tenn. Ct. App. W.S. Jan. 12, 2007) ("DCS is not required to establish reasonable efforts in cases involving the statutory ground of mental incompetence of the parent.")  Father's parental rights were terminated based on failure to file a petition to establish paternity, which is one of the grounds listed in subsection (g)(9).[8]  Father has

---

[7] We note that in making this statement, the ***J.L.E.*** Court was addressing a different situation than we face. Nonetheless, the Court recognized the purpose of the notice provisions and that the purpose is not served if notice is provided after the conduct at issue has occurred.  In that case, DCS had filed a petition to terminate a mother's rights for abandonment based on her failure to provide a suitable home or demonstrate concern for her child for a period of four months following the child's removal. ***Id.*** at *7.  DCS gave the Mother the required notice of the definition of abandonment after it had already filed the termination petition, and the Court held that giving her such notice did not meet the statutory notice requirement, explaining:

> With regard to the definition of abandonment occurring in the first four months after the child is removed from the home, that notice would need to be given quickly and clearly. If a parent is notified after the fact, i.e., after the four months has run, he or she has no way to avoid the consequences and cannot remedy the situation. In that situation, the purpose of the notice requirements is not fulfilled.

***Id.*** at *9.

[8] Tennessee Code Annotated section 36-1-113(g)(9) provides the following additional grounds for termination, which apply to non-legal parents:

> (i) The person has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child in accordance with the person's financial means promptly upon the person's receipt of notice of the child's impending birth;
> (ii) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;
> (iii) The person has failed to seek reasonable visitation with the child, and if visitation has been

(continued...)

not cited any cases in support of his assumption that DCS is required to demonstrate reasonable efforts when termination is based on the grounds listed in (g)(9), and we are not aware of any such authority. The grounds listed in (g)(9) are "less stringent" and "less difficult to prove than the grounds in Tenn. Code Ann. § 36-1-113(g)(1)-(8)[.]" *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *9 (Tenn. Ct. App. Apr. 25, 2005) (citing *In re S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 WL 2804892, at *6 (Tenn. Ct. App. Dec. 6, 2004)). These additional grounds apply to non-legal parents and may be applied "to persons who have established legal parentage, but did so subsequently to the filing of a petition seeking termination of their parental rights." *In re D.A.H.*, 142 S.W.3d 267, 272-73 (Tenn. 2004).

Father's brief discusses DCS's obligation to utilize reasonable efforts to make it possible for the child to return to his or her family. However, he does not appear to argue that DCS should have allowed him to assume custody of Olivia. In fact, he testified at trial that he informed DCS that he was in no position to take custody of Olivia, stating, "I was too involved with what I was doing at that time. And some of it might not have been good." He then said he "was probably just messed up a little still, you know, messed up in the head a little bit."

Father's main argument regarding "reasonable efforts" is that DCS failed to use reasonable efforts to place Olivia with his Aunt, and he cites Tennessee Code Annotated section 37-2-403(d), which provides:

> Whenever a child is removed from such child's home and placed in the department's custody, the department shall seek to place the child with a fit and willing relative if such placement provides for the safety and is in the best interest of the child.

This statute, as discussed earlier in this opinion, governs permanency plans for children in foster care. In *In re K.L.D.R.*, No. M2008-00897-COA-R3-PT, 2009 WL 1138130, at *8 (Tenn. Ct. App. Apr. 27, 2009), another parental termination case, a mother similarly argued that DCS "failed to attempt to place [the child] with a fit and willing relative pursuant to Tenn. Code Ann. § 37-2-403(d)." The Court stated that "this issue concerns custody and should have been raised in the dependency and neglect proceeding. It is not a basis to defeat a petition to terminate parental rights." *Id.* In any event, however, "T.C.A. § 37-2-403(d) does not mandate relative placement. Rather, the statute requires DCS to consider such placement in light of the safety and best interest of the child."

---

[8](...continued)

granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102(1)(C);

(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3)[.]

***State, Dept. of Children's Services v. Hardin***, No. W2004-02880-COA-R3-PT, 2005 WL 1315812, at *16 (Tenn. Ct. App. May 26, 2005). We have also recognized that because "reunification is a two-way street," a parent cannot be heard to complain when a relative who initially inquires about custody then fails to take any further action, so that the relative's lack of consideration for placement was due to his or her own failure to act. ***In re Jeremiah T.***, No. E2008-02099-COA-R3-PT, 2009 WL 1162860, at *10 (Tenn. Ct. App. Apr. 30, 2009). Such is the case here. Aunt testified that she told the case manager that she would discuss the idea of taking custody of Olivia with her fiancé and pray about it. Aunt also testified that she "got discouraged" when she learned that she would be responsible for providing Olivia with "health care." According to DCS records, a home study and background check were scheduled in order to investigate placement with Aunt, but Aunt stopped returning the case manager's phone calls, and the studies were never completed. Although Aunt denied that she failed to return any messages, the trial court specifically found that Aunt "felt she was unable to care for the child if the child would not be eligible to receive state benefits, including health insurance. [Aunt] did not pursue Olivia after learning about Olivia's special medical needs and that the state could not provide health insurance if the child were to be placed in her custody." Thus, we find that DCS utilized reasonable efforts in dealing with Aunt.

Father also implies that it was DCS's fault that he did not establish paternity, claiming that DCS failed to notify him of scheduled parentage tests and failed to offer to pay for a test. However, the case manager testified that when she met with Father in January 2006 and discussed his obligation to establish paternity, Father refused DCS's assistance and said that he knew people at juvenile court and would do it himself. The case manager testified that Father did *not* say that he could not afford to pay for the parentage test. The juvenile court found, in March 2006, that Father had "refused the Department's offer of paternity testing to legitimate the child." The affidavit of reasonable efforts submitted by the DCS case manager in March 2006 also states that Father "refused services from DCS and stated he would contact J[uvenile] C[ourt] himself to have the said child legitimated." Despite Father's statements, however, the case manager sent a referral to juvenile court and a parentage test was scheduled. The case manager testified that she sent notice of the test date to Father by mail and called him and left a message, but he initially denied receiving any notice of the test. Upon further questioning, however, Father said he did not deny that the notice was sent to his house, but he said he did not receive it because he was "working offshore."[9] The case manager testified that at least two dates were set for parentage testing, and Father failed to appear at either appointment. Olivia's foster mother testified that she brought Olivia to court in October of 2006 for parentage testing, and Father did not show up. The trial court found that "[Father] did not petition for paternity until after the filing of the termination of parental rights petition, despite being asked on numerous occasions to establish parentage." The judge also stated at the conclusion of the proof, "I believe that [Father] was aware that he needed to legitimate this child. And I think that was made very clear to him. I also believe the testimony today [that Father] sa[id], 'I think I can handle this on my own because I know people at juvenile court.'" In sum, we find that Father's failure to establish paternity was due to his own inaction, not because of DCS. Father does not dispute that

---

[9] Father testified that he "worked offshore" for four to five months at a time. He first said that he was traveling from city to city promoting his band, but then said that he was working on a barge.

he received notice of his alleged paternity from Mother prior to Olivia's birth, yet he did not file his petition to establish paternity prior to the filing of the termination petition. Thus, we find no error in the trial court's finding that grounds existed for terminating Father's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(9)(vi) due to his failure to file a petition to establish paternity.

### D.  Best Interest

Finally, we will address whether termination of the parents' parental rights was in Olivia's best interest.[10] "The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Once grounds for termination have been found, the focus of the proceedings shifts to the best interest of the child. *Id.* Tennessee Code Annotated section 36-1-113(i) provides a list of some factors to consider in determining whether termination of parental rights is in the best interest of the child:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

---

[10] We note that Father did not raise any issue challenging the trial court's best interest finding.

We must determine the child's best interest from the child's, rather than the parent's, perspective. *In re Marr*, 194 S.W.3d at 499.

Olivia was three years old at the time of trial. She had been in the same foster home since she was three days old. The trial court found that she was "thriving" in the home of her foster parents and had no bond with either of her biological parents. When the termination petition was filed, Olivia was eighteen months old, and each of her parents had only visited with her twice. Neither parent had visited with her in the past year.

As previously discussed, Mother and Father were previously addicted to crack-cocaine. Mother testified that Father used to beat her, and that they would physically fight over drugs. At trial, both parents blamed DCS for their problems but admitted that they continued using drugs after Olivia was born until they were both arrested.[11] Mother testified that she had completed parenting classes and alcohol and drug counseling while in prison, and she said she had been "clean and sober" for three years and one month. However, she had only been out of prison for one month after serving a three year sentence. She still had an active warrant pending for violation of probation and faced the possibility of serving an additional year in jail. Mother was living with her mother at the time of trial, and Father was living with his father. Father presented evidence that he had recently completed a program required by the Shelby County Drug Court when he violated his probation, which involved attending group meetings and passing over forty drug screens.

Although Mother had some supervised visits with Olivia in prison while the termination case was pending, the DCS case manager would not say that there was a bond between Mother and Olivia. Father had also attended ten to twelve visits with Olivia, and when asked if Olivia knew who he was, Father said, "I think she does." The case manager said Olivia considered her foster parents to be her mom and dad, and her foster parents also had three other children with whom Olivia had bonded. Olivia's foster parents testified that Mother and Father had never called to ask about Olivia, nor did they send financial support, birthday cards or Christmas presents for her. Both foster parents testified that they wished to adopt Olivia if the biological parents' rights were terminated.

Having reviewed the aforementioned factors and the entire record in this case, we find by clear and convincing evidence that termination of both parents' parental rights is in Olivia's best interest.

---

[11] Father was arrested in April of 2006 for possession of cocaine with intent to manufacture, sell, or deliver, but the charge was "amended down to simple possession," and he served 19 days in jail and was placed on probation.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the juvenile court terminating the parental rights of Mother and Father. Costs of this appeal are taxed to the appellants, Jennifer B. and Jerry F., for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.